**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

JUSTIN ADKINS,

                                        Plaintiff,

                    -against-

THE CITY OF NEW YORK, a municipal entity;
MICHAEL BLOOMBERG, former Mayor of the City
of New York; RAYMOND KELLY, former New
York City Police Commissioner;  JOSEPH ESPOSITO,
former New York City Police Chief of Department;
JAMES HALL, Chief of Patrol, New York City Police
Department; PATRICK DEVLIN, Former Assistant
Chief, Criminal Justice Bureau, New York City Police
Department; New York City Police Department
Captain Jack JASKARAN; New York City Police
Officer KENDAL CREER, Shield No. 24657; New
York City Police Officer VERGA; New York City
Police Officer John Doe 1, New York City Police
Officer JANE DOE 1; New York City Police
Supervisors and Commanders RICHARD and
RACHEL ROEs 1-50; New York City Police Officers
JAMES and JULIE DOES 1-50; individually and in
their official capacities, jointly and severally, (the
names John and Jane Doe, Richard and Rachel Roe
and James and Julie Doe, being fictitious, as the true
names of these defendants are presently unknown),
                                        Defendants.

-------------------------------------------------------------X

**COMPLAINT**

**14 Civ. 07519**

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.     Plaintiff brings this action for compensatory damages, punitive

damages, attorney's fees, and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and

the First, Fourth, and Fourteenth Amendments of the United States Constitution,

for violations of his civil rights, as said rights are secured by said statutes and the

Constitution of the United States.

2.      It is alleged that individual police officer defendants made an unreasonable seizure of the plaintiff's person by interfering with his freedom of movement and then arresting him without individualized determination of probable cause at an Occupy Wall Street protest which took place on October 1, 2011 on the Brooklyn Bridge. It is also alleged that individual police officer defendants used unreasonable and excessive force against plaintiff, engaged in unreasonable conduct during his seizure, including subjecting him to excessive, unreasonably prolonged, unnecessary and punitive detention, as well as excessive, unnecessary, discriminatory and punitive conditions of confinement that were shocking to the conscience. It is also alleged that plaintiff was intentionally subjected to such unreasonable conduct by defendants based on his transgender identity and because he engaged in activities protected by the First Amendment.

3.      The defendants in this action, THE CITY OF NEW YORK, a municipal entity; MICHAEL BLOOMBERG, former Mayor of the City of New York and the Mayor at the time of this incidents complained herein; RAYMOND KELLY, former New York City Police Commissioner and the Commissioner at the time of the incidents complained herein; JOSEPH ESPOSITO, former Chief of Department, New York City Police Department, and the Chief of Department at the time of the incidents complained herein; JAMES HALL Chief of Patrol of the New York City Police Department, PATRICK DEVLIN, Former Assistant Chief, Criminal Justice Bureau, and the Assistant Chief, Criminal Justice Bureau at the time of the incidents complained herein; New York City Police Captain JACK JASKARAN; New York City Police Officer KENDAL CREER, Shield No. 24657;

New York City Police Officer VERGA; New York City Police Officer JOHN DOE 1, who illegally and unjustifiably removed plaintiff from a cell at the 90th Precinct where he was being held with other arrestees, and illegally, unconstitutionally and unjustifiably and discriminatorily handcuffed plaintiff to a bar in the only working bathroom in the precinct for an excessive period of time causing him to suffer, pain, injury, embarrassment, humiliation and ridicule; New York City Police Officer JANE DOE 1, who forcibly grabbed plaintiff and moved him into an uncomfortable position while he was handcuffed to the bar, which caused the Plaintiff further pain and injury; New York City Police Supervisors and Commanders RICHARD and RACHEL ROEs 1-50; New York City Police Officers JAMES and JULIE DOES 1-50, (the names John and Jane Doe, Richard and Rachel Roes, and JAMES and JULIE Does being fictitious, as the true names of these defendants are presently unknown), individually and in their official capacities, jointly and severally, implemented, enforced, encouraged, sanctioned and/or ratified policies, practices, and/or customs to punish peaceful protest by Occupy Wall Street, *inter alia*, (i) engaging in indiscriminate mass arrests which were unlawful and without probable cause; and (ii) subjecting those arrested to unlawful conditions of confinement, including harassment and unreasonable conditions of detention for an inordinate and unreasonable amount of time; and (iii) discriminating against transgender arrestees by holding them under unreasonable and discriminatory conditions of confinement.

4.      Plaintiff seeks (i) compensatory damages for the injuries caused by defendants' unlawful conduct; (ii) punitive damages assessed against the individual defendants to deter such intentional or reckless deviations from well-

settled constitutional law; (iii) an award of attorneys' fees and costs; (iv) a declaratory judgment that the policies, practices and/or customs described herein violate the First, Fourth, and Fourteenth Amendments; (v) injunctive relief ordering the destruction of all fingerprints, in whatever form existent, taken of plaintiff pursuant to his arrest, including those fingerprints transmitted to and retained by the New York State Division of Criminal Justice Services and the FBI; (vi) injunctive relief ordering that plaintiff's arrest record be expunged; and (vii) such other relief as this Court deems equitable and just.

## JURISDICTION

5.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

6.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343 (3) and (4), as this action seeks redress for violation of plaintiff's constitutional, civil, statutory, and common law rights.

7.      Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

## VENUE

8.      Venue is properly laid in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 (a), (b) and (c).

## JURY DEMAND

9.      Plaintiff respectfully demands a trial by jury of all issues in this action and on each and every one of his damage claims, pursuant to Federal Rule of Civil Procedure 38(b).

## PARTIES

10.     Plaintiff JUSTIN ADKINS is a transgender man who is, and was at all relevant times, a resident of Williamstown, Massachusetts.

11.     Defendant the CITY OF NEW YORK ("the City") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

12.     Defendant the CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, the CITY OF NEW YORK.

13.     Defendant MICHAEL BLOOMBERG was the Mayor of the City of New York at all relevant times, and the chief policy making official for the City and its departments, including the New York City Police Department ("NYPD"), and was responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued in his individual and official capacity.

14.     Defendant RAYMOND KELLY was at all times relevant herein, the Police Commissioner for the City of New York, and he was responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued in his individual and official capacity.

15.     Defendant JOSEPH ESPOSITO was at all times relevant herein, the Chief of Department of the NYPD, and he was responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued individually and in his official capacity.

16.     Defendant JAMES HALL was at all times relevant here the Chief of Patrol for the NYPD, and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued individually and in his official capacity.

17.     Defendant PATRICK DEVLIN was at all times relevant here the Assistant Chief, Criminal Justice Bureau, and he was responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued individually and in his official capacity.

18.     Defendant JACK JASKARAN was at all times relevant here a Captain in the New York City Police Department and he was responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued individually and in his official capacity.

19.     Defendant New York City Police Officer KENDAL CREER, Shield No. 24657 was at all times relevant here a Police Officer in the New York City Police Department and was plaintiff's arresting officer. He is sued individually and in his official capacity.

20.     Defendant New York City Police Officer VERGA was at all times relevant here a Police Officer in the New York City Police Department and engaged in discriminatory and abusive harassment of plaintiff while conducting a search of plaintiff on the Brooklyn Bridge. She is sued individually and in her official capacity.

21.     New York City Police Officer JOHN DOE 1, was at all times relevant here a Police Officer in the New York City Police Department who illegally, unconstitutionally, unjustifiably and discriminatorily removed plaintiff from a cell where he was being held with other arrestees at the 90th precinct and handcuffed him to a bar in the only working bathroom in the precinct for an excessive period of time causing him to suffer, pain, injury, embarrassment, humiliation and ridicule. He is sued individually and in his official capacity.

22.     New York City Police Officer JANE DOE 1 was at all times relevant here a Police Officer in the New York City Police Department who forcibly grabbed plaintiff and moved him into an uncomfortable position while he was handcuffed to the bar in the bathroom of the 90th precinct, which caused the plaintiff further pain and injury, among other things. She is sued individually and in her official capacity.

23.     New York City Police Supervisors and Commanders JOSEPH ESPOSITO, Former Chief of Department, New York City Police Department; JAMES HALL, Chief of Patrol, New York City Police Department; PATRICK DEVLIN, Former Assistant Chief, Criminal Justice Bureau; New York City CAPTAIN JACK JASKARAN; New York City Police Officer KENDAL CREER, Shield No. 24657; New York City Police Officer VERGA; New York City Police

Officer JOHN DOE 1, who illegally, unconstitutionally, unjustifiably and discriminatorily removed plaintiff from a cell where he was being held with other arrestees at the 90th precinct and handcuffed him to a bar in the only working bathroom in the precinct for an excessive period of time causing him to suffer, pain, injury, embarrassment, humiliation and ridicule; New York City Police Officer JANE DOE 1, who forcibly grabbed plaintiff and moved him into an uncomfortable position while he was handcuffed to the bar which caused the plaintiff further pain and injury, among other things; New York City Police Supervisors and Commanders RICHARD and RACHEL ROEs 1-50; and New York City Police Officers JAMES and JULIE DOEs 1-50, are NYPD Command and Police Officers who were involved in the arrest and detention of the plaintiff, and all of the actions and conduct associated therewith, including, *inter alia*, the use of force, the proffering of charges, the approval of charges, the prosecution of plaintiff, the abuse of criminal process, the excessive and unnecessary detention, the discriminatory, harassing and unlawful conditions of detention to which plaintiff was subjected, and the implementation of the challenged policies and practices in question herein, and/or actually arrested, transported, harassed, and/or unreasonably detained the plaintiff, all without probable cause or lawful justification or privilege, and who implemented the policies, practices, and procedures referenced herein to unreasonably seize and detain the plaintiff, or failed to intervene to prevent violations of plaintiff's constitutional rights. They are sued individually and in their official capacities.

24.     Upon information and belief, defendants BLOOMBERG, KELLY, ESPOSITO, HALL, DEVLIN, JASKARAN and RICHARD ROEs were personally

involved in formulating and/or implementing the policies and procedures that resulted in plaintiff's unlawful arrest, search, incarceration and prosecution and the unreasonable, unnecessary, discriminatory and unconstitutional conditions of his confinement.

25. Defendants BLOOMBERG, KELLY, ESPOSITO, HALL, DEVLIN, JASKARAN, New York City Police Officer KENDAL CREER, Shield No. 24657; New York City Police Officer VERGA; New York City Police Officer JOHN DOE 1, New York City Police Officer JANE DOE; 1 RICHARD and RACHEL ROEs 1-50; and New York City Police Officers JAMES and JULIE DOEs 1-50 are duly sworn, appointed, or acting officers and/or employees and/or agents of the City of New York. They include the individuals who directed and/or authorized the interference with, and/or prevention of, the plaintiff's participation in protected speech, protest, assembly and association; unreasonable arrest and detention of plaintiff; use of unreasonable and excessive force against plaintiff; unlawful detention of plaintiff; and transphobic harassment and discrimination against plaintiff; and/or actually arrested, transported, detained, used unreasonable and excessive force against, harassed, and/or unlawfully detained the plaintiff, all without probable cause, lawful justification, privilege or consent, and who implemented the policies, practices, and procedures referenced herein to unreasonably detain and search the plaintiff.

26. At all times relevant herein, defendants BLOOMBERG, KELLY, ESPOSITO, HALL, DEVLIN, JASKARAN, New York City Police Officer KENDAL CREER, Shield No. 24657; New York City Police Officer VERGA; New York City Police Officer JOHN DOE 1, New York City Police Officer JANE DOE 1,

RICHARD and RACHEL ROEs, JAMES and JULIE DOEs, either personally or through their subordinates, acted under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or the City of New York.

27.     Each and all of the acts of the defendants alleged herein were undertaken by said defendants while acting in the course and scope of their duties and functions as agents, employees, and officers of the CITY OF NEW YORK and/or the NYPD when engaging in the conduct described herein.

28.     At all times relevant herein, defendants acted for and on behalf of the CITY OF NEW YORK and/or the NYPD, in furtherance of their employment by defendant the CITY OF NEW YORK, with the power and authority vested in them as officers, agents and employees of the City and/or the NYPD and/or incidentally to the lawful pursuit of their duties as officers, employees and agents of the City and/or the NYPD.

29.     At all times relevant herein, defendants BLOOMBERG, KELLY, ESPOSITO, HALL, DEVLIN, JASKARAN, New York City Police Officer KENDAL CREER, Shield No. 24657; New York City Police Officer VERGA; New York City Police Officer JOHN DOE 1; New York City Police Officer JANE DOE 1; RICHARD and RACHEL ROEs, JAMES and JULIE DOEs, violated clearly established constitutional standards under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution of which a reasonable police officer and/or public official under their respective circumstances would have known.

## FACTUAL ALLEGATIONS

30.     In advance of the October 1, 2011 march at which plaintiff was arrested, the defendants had knowledge of the Occupy movement, the physical encampment and base of operations at Zuccotti Park, and the fact that persons associated with the Occupy movement had engaged in First Amendment protected activities, including political marches, as a form of political expression and action.

31.     In advance of the October 1, 2011 march, on information and belief, defendants KELLY and BLOOMBERG had communicated and conferred regarding how the NYPD would respond to the Occupy related activities, including protest marches.

32.     In advance of the October 1, 2011 march, the NYPD had knowledge that a march would occur on October 1, 2011 from Zuccotti Park to the Brooklyn Bridge Park, where there was an announced event featuring speakers including Amiri Baraka, author, poet and playwright.

33.     On October 1, 2011 demonstrators began marching from Zuccotti Park near Wall Street, which the demonstrators dubbed Liberty Square. The demonstrators were engaged in mass assembly and collective action including calling for a shifting of resources in society from the 1% of the population who hold the greatest concentration of wealth and corporate power, to the other 99%. The protesters' political chants included "We are the 99 percent" and "Banks got bailed out, we got sold out!"

34.     Plaintiff was present at Zucotti Park and joined the march at this location.

35.     The march moved initially from Zuccotti Park towards the Brooklyn Bridge.  Plaintiff was one of the many marchers.

36.     The NYPD presence at Zuccotti Park and along the march was substantial, consisting of the deployment of officers on foot, officers on bicycles, officers on motorscooters and/or motorcycles, officers in cruisers and officers in other types of vehicles.

37.     Police had staged and arrayed their resources, personnel and assets including officers, weapons, amplified sound equipment and other crowd control devices sufficient for the march.

38.     On information and belief, NYPD command staff monitored the movement of the march, including in the police headquarters and in command centers, including mobile command centers. One Police Plaza, the headquarters of the NYPD and the location of Police Commissioner RAYMOND KELLY's office, is located at the base of the Brooklyn Bridge.

39.     On information and belief, defendant and Police Commissioner RAYMOND KELLY monitored the march as it proceeded.

40.     On information and belief, defendant KELLY was in communication with subordinate command staff in the field and in physical proximity to the march.

41.     Thousands of people comprised the October 1, 2011 march.

42.     The defendants were aware of the start of the march.

43.     The NYPD permitted, and did not impede, the start of the march from Zuccotti Park.

44.     The NYPD permitted the march to proceed upon the public ways from Zuccotti Park and through downtown Manhattan.

45.     The NYPD permitted the march to proceed to the Brooklyn Bridge and, ultimately, permitted the march to proceed upon the vehicular roadway of the Brooklyn Bridge.

46.     The NYPD used officers, including flanking the march with officers on motorscooters or motorcycles, to escort the march from Zuccotti Park to the Brooklyn Bridge.

47.     The NYPD officers escorting the march "guided" and exercised control over the conduct of the march through their physical presence, show of police force and authority, and specifically through the issuance of orders and directives to individuals within the march.

48.     The march as a whole, and the individuals within the march, including plaintiff, understood that the NYPD was escorting and permitting the march to proceed.

49.     Plaintiff personally observed members of the NYPD escorting the march as it proceeded from Zuccotti Park to the Brooklyn Bridge.  He observed them walking alongside the march, and he observed NYPD officers block vehicular traffic to allow the marchers to proceed marching.

50.     As the march proceeded towards the Brooklyn Bridge, the NYPD knew and observed that the march of several thousand individuals was compliant with police directives and, indeed, and followed the police directives.

51.     At points and times, the police directed and permitted marchers to proceed in ways ordinarily prohibited under traffic regulations absent police directive or permission.

52.     At some intersections along the march, police blocked vehicular traffic, directing and permitting marchers to cross the street against the traffic signal.

53.     Marchers, including plaintiff, relied on the orders and signals by the police that this, ordinarily prohibited, conduct was at that particular time and place being allowed by the police who were guiding and escorting the march.

54.     In general, the marchers relied on the police for directives and indications as to what actions were being permitted at what times, so that they could conform their conduct and comply with the orders and indications being given by police.

55.     Later in the march, when police led and escorted and permitted marchers *en masse* onto the roadway of the Brooklyn Bridge, marchers understood that they were being led and escorted and permitted onto the roadway of the Brooklyn Bridge by the New York City Police Department.

56.     As the front of the march reached City Hall Park, those in the front of the march crossed Centre Street and moved to the pedestrian walkway or promenade of the Brooklyn Bridge.

57.     When the front section of the march encountered the narrow pedestrian walkway of the bridge, there was a natural congestion as the large group began to file onto the smaller walkway. It took some period of time for the first portion of the march to enter upon the walkway, which occurred without

14

disturbance.  Plaintiff joined the marchers as they headed onto the pedestrian walkway.

58.     At the entrance point to the walkway flowing back across Centre Street, along Park Row and in the broad sidewalks abutting City Hall Park, thousands more were in the march. This march had been occurring for a substantial time without any noncompliance with lawful police orders.

59.     Police, including command officials and other city officials, stood in an eastbound roadway at the entrance of the bridge.

60.     The police observed the congestion of persons in the roadway near the entrance to the Brooklyn Bridge promenade.

61.     The command officials gave no *audible* warnings or orders to the mass of people assembled.

62.     The NYPD knew no audible communication was given to the hundreds and thousands potentially subject to arrest.

63.     The NYPD also knew that the Constitution requires that any ostensible command must be heard by those who are expected to be bound by it.

64.     There was no attempt by the NYPD to communicate a command, order or other message to the whole of the mass of people at the base of the bridge.

65.     The police possess amplified sound equipment sufficient to project and be heard for blocks.

66.     Having initially stood in the eastbound roadway of the Brooklyn Bridge, the command staff and police at the roadway entrance then turned

around, and led the midsection[1] of the march across the bridge.  Plaintiff

observed the police lead the marchers onto the roadway of the bridge.

67.     From that moment on, no orders were issued from the police at the

roadway entrance for the ongoing flow of marchers to not proceed on the

roadway.

68.     Police continued to escort the march along its side, with no police

on the flanks ordering or directing the march they had been escorting that

afternoon against entering or being present upon the roadway of the bridge. On

the contrary, these officers - - who had not hesitated at any time during the

march towards the Bridge to direct people on the sidewalks when they so desired

- - did not warn against entering or continuing upon the Bridge roadway.

69.     As marchers followed the police officials onto the Brooklyn Bridge

roadway, there was no effort by the police to stop the marchers from entering or

continuing upon the roadway. On the contrary, NYPD command staff or "white

shirts" led the march onto the roadway of the bridge.

70.     Police permitted the march to proceed upon the roadway of the

bridge.

71.     The police led the march across the bridge - - a decision which

would hardly be viewed by march participants or observers as unlikely, given that

traversing the roadway or a portion of the roadway would have affected an

orderly and faster movement of the march across.

---

[1] The original front of the march had entered onto the pedestrian walkway with several hundred others.

72.     When the police turned and led the march onto the roadway, those who could see this actual and apparent grant of permission to follow let out a cheer believing police were permitting them to cross the bridge on the roadway.

73.     After the police led and escorted the march onto the roadway, scores of the marchers who had originally entered upon the pedestrian walkway joined the others on the roadway, including the plaintiff, when it became clear that police were leading and escorting and permitting marchers to use the roadway to cross the bridge.

74.     From all of his observations, plaintiff understood that the march was permitted to proceed upon the bridge, led by the police. He did not hear any warnings, orders, directives or indications from police that following the march was not permitted.  Thus, the police deprived the plaintiff of any fair notice that following the lead and escort of police across the bridge roadway was somehow prohibited.

75.     He was shocked and confused when police formed a line, blocking movement, and began to implement the arrest. He could not understand what he had done wrong, given that police had permitted, led and escorted the march without objection.

76.     The police, having led and escorted hundreds of marchers upon the roadway of the Brooklyn Bridge, mid-way across the bridge arrested over seven hundred people for being present upon the bridge, precisely where the police had led them and permitted them to march.

77.     Prior to terminating the march when it was mid-way across the bridge, the police did not convey that they were going to revoke the actual or apparent permission of the march to proceed.

78.     Midway across the bridge, when the police stopped all forward movement of the march, an officer spoke inaudibly into a bullhorn that could not be heard mere feet away from the officer, given ambient noise.

79.     Again, the NYPD knew no audible communication was given.

80.     Plaintiff was blocked from forward movement by the police.

81.     Plaintiff was ultimately prevented from moving backward as the NYPD prevented dispersal through the use of orange netting and police vehicles.

82.     Plaintiff was near a woman on the roadway of the bridge who asked an NYPD uniformed officer if they could go towards the entrance of the bridge to leave the area.

83.     The NYPD uniformed officer said they could move towards the back of the bridge near the entrance at Park Row.

84.     Plaintiff then looked toward the back of the march and observed NYPD police officers using orange netting to prevent people from leaving from the back of the march at Park Row and arresting people.

85.     When the plaintiff informed the NYPD officer that he observed the arrests in the back, the NYPD officer shrugged his shoulders.

86.     Defendants ESPOSITO, HALL, JASKARAN, ROEs and the other superiors met and or conferred with one another and they agreed to illegally detain the marchers on the roadway of the Brooklyn Bridge and to engage in a mass arrest of all those present, including plaintiff, knowing full well that the

marchers had not violated any law or municipal ordinance and that there was no probable cause to believe the plaintiff or any other marchers committed a crime or violation of the law justifying their arrest.

87.    These Defendants then ordered RICHARD and RACHEL ROES and JAMES and JULIE DOES to close off egress at the front and back of the march on the Brooklyn Bridge and to arrest every single person on the bridge.

88.    NYPD officers, including some of the DOE and ROE defendants, subsequently blocked any movement at the front or back of the march on the Brooklyn Bridge, thus preventing all individuals located on the Brooklyn Bridge in proximity to the intersection of Park Row and Chambers Street from leaving the area.

89.    The plaintiff, along with hundreds of others was then subject to a mass false arrest by the NYPD by the Defendants.

90.    Plaintiff observed people ahead of him on the bridge being methodically handcuffed.

91.    All of the Defendants who participated in, or otherwise caused, the arrests of the plaintiffs did so in disregard of their actual knowledge that the march had been permitted and led and escorted onto the roadway of the bridge.

92.    At no time did plaintiff hear any communication from NYPD officers that his continued presence on the bridge would subject him to arrest.

93.    At no time was plaintiff given a reasonable opportunity to comply with any order to disperse from the roadway of the Brooklyn Bridge or risk arrest.

94.    At no time did the plaintiff fail to obey a police order. At no time did the plaintiff engage in disorderly conduct. At no time did the plaintiff block

vehicular traffic on the Brooklyn Bridge, as the police had stopped vehicular traffic, opened up the roadway to pedestrian traffic, and themselves led and escorted the demonstration onto the roadway with police command officials at the lead.

95.     When police conducted the mass arrest, they were aware that the group detained included people, like the plaintiff, who had joined the march on the roadway of the Brooklyn Bridge from the pedestrian walkway at the direction of or with the consent of NYPD officers.

96.     Plaintiff was handcuffed and arrested with scores of others on the Brooklyn Bridge.

97.     At no time was plaintiff given an order or meaningful opportunity to disperse, advised that his conduct might be considered unlawful, or advised that his presence or conduct at that location would subject him to arrest.

98.     Shortly thereafter, at the decision and direction of Defendants ESPOSITO, HALL, JASKARAN and RICHRAD AND RACHEL ROEs, defendant CREER handcuffed and placed him under arrest, despite defendants' knowledge that they lacked probable cause to do so.

99.     Plaintiff's arrest was effected without a warrant or probable cause.

100.    Later, defendant CREER signed a criminal complaint attesting, under the penalty of perjury, that he personally observed plaintiff engage in acts he did not witness and that he did not commit.  Specifically, defendant CREER falsely alleged that plaintiff obstructed and prevented traffic on the Brooklyn Bridge, knowing full well that the NYPD stopped the flow of traffic onto the

Bridge before plaintiff other marchers followed the NYPD officers onto the Bridge.

101.    During his arrest, plaintiff alerted a legal observer to the fact that he is transgender. Overhearing plaintiff's identification of his gender identity, defendant CREER proceeded to ask plaintiff inappropriate and unnecessary questions regarding plaintiff's anatomy and genitalia, including what did he "have down there." Such questioning is uncalled for, serves no lawful purpose, and is derogatory, rude and discriminatory.

102.    Defendant CREER asked plaintiff whether he wanted to have a male or female pat him down. In response, plaintiff said it was ok for Defendant CREER, a male, to pat him down. Defendant CREER nevertheless asked defendant VERGA, a female officer, to pat plaintiff down.

103.    Defendant VERGA subsequently searched plaintiff as he remained detained on the Brooklyn Bridge, incorrectly and discriminatorily referring to plaintiff with female pronouns thereby denying plaintiff his gender identity.

104.    Plaintiff was detained on the Brooklyn Bridge for an extended period of time without access to water, food, or bathroom facilities.

105.    Plaintiff was eventually transported to the 90th precinct after being detained on a bus that drove around Brooklyn for an extended period of time.

106.    While detained at 90th precinct, plaintiff was subjected to unreasonable conditions of detention, denial of adequate food and water, denial of access to adequate toilet facilities, and/or denial of access to counsel.

107.    Plaintiff was held and detained in police custody for approximately 10 hours.

108.    Upon arrival at the 90th precinct, plaintiff was initially held with other men.  Plaintiff has no concerns with his placement with other men, and the men he was detained with raised no concerns about the fact that he was detained with them.  At no time did plaintiff or any person he was being held with raise any safety concerns whatsoever.

109.    However, after a brief period of time, plaintiff was removed from the cell by Defendant JOHN DOE 1, a NYPD Officer, and taken to an area with two cells and a bathroom, where this officer ordered plaintiff to sit in a chair. After plaintiff complied with this order, Defendant JOHN DOE handcuffed plaintiff's right wrist to a metal handrail next to the bathroom.

110.    Plaintiff was left handcuffed to the rail in the precinct bathroom in this unnatural and uncomfortable position throughout the remainder of his detention at the 90th Precinct, which lasted over seven hours.

111.    Being forced to remain in this position for several hours caused plaintiff to suffer pain, injury, and discomfort and he suffered pain and soreness in his wrist, arm, shoulder and back for approximately a week thereafter.

112.    At the time of plaintiff's incarceration there was only one working toilet in the precinct, located immediately adjacent to where plaintiff was handcuffed to a metal rail. As a result, plaintiff was forced to endure a steady stream of arrestees, who had been denied access from toilet facilities for hours up to this point, using the toilet immediately next to him, along with the accompanying odor of urine, for the remaining period of his detention.

113.    At one point, Defendant JANE DOE 1, a New York City Police Officer, abruptly turned plaintiff's chair while his right hand was still cuffed to

the railing in such a way as to pin his arm behind his back in an another painful position.

114.   During his detention plaintiff was also subjected to ridicule by NYPD officers at the 90th precint.

115.   At one point, upon information and belief, Defendant JANE DOE 1 informed Defendants JAMES and JULIE DOEs that plaintiff is transgender. Plaintiff then observed Defendants JANE DOE and JAMES and JULIE DOEs gawking, giggling and staring at him causing him embarrassment and to feel humiliated.

116.   During his detention, plaintiff was denied food, notwithstanding the fact that other people arrested at the Brooklyn Bridge and held at the 90th precinct were offered sandwiches.

117.   No other arrestees held at the 90th precinct during the period of plaintiff's detention, all of whom appeared to be non-transgender, were removed from their cells and handcuffed to metal bars.

118.   Plaintiff was subjected to these unreasonable conditions of confinement at the direction of supervisors RICHARD and RACHEL ROEs who were acting pursuant to a *de facto* practice or custom of the NYPD to subject transgender arrestees to unreasonable conditions of confinement, including handcuffing individuals to railings in uncomfortable positions for excessive periods of time, to which nontransgender arrestees are not subjected.

119.   Defendants initiated criminal proceedings against plaintiff despite defendants' knowledge that they lacked probable cause to do so.

120.    During the period between October 1, 2011 and a date no later than August 6, 2013, plaintiff was required to attend approximately eight court appearances to defend himself, in the criminal proceedings that defendants had initiated against him causing plaintiff to miss work and expend costs to travel from Massachusetts to New York City for each court date

121.    On a date no later than August 6, 2013, all charges against plaintiff were dismissed.

122.    As a direct and proximate result of defendants' actions pursuant to wrongful policies, practices, customs and/or usages complained of herein, plaintiff has suffered, *inter alia*, physical, mental, and emotional injury and pain, violation of his right to privacy, mental anguish, suffering, humiliation and embarrassment, and deprivation of his constitutional rights.

## **DEFENDANTS' POLICIES, CUSTOMS, AND PRACTICES**

### **Defendants' Unconstitutional Mass Arrest Policy**

123.    A series of protests were organized under the rubric of Occupy Wall Street in New York City in the summer and fall of 2011.

124.    In response to these protests, defendants CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, HALL, DEVLIN, JASKARAN, and ROEs 1-50 implemented policies, practices or customs of indiscriminately arresting without just or probable cause large groups of people who were peacefully assembled, and who were either participating in, supporting, observing, or in the vicinity of demonstrations and protests. Specifically, defendants adopted a custom, pattern and practice of giving marchers the appearance of approving, condoning, directing, or ratifying conduct which would otherwise be unlawful, such as

marching in the streets, and then arresting marchers *en masse* without providing constitutionally sufficient notice that their conduct was no longer ratified and that their continued presence at the location where NYPD officers had led them would subject them to arrest, and without providing marchers with a reasonable opportunity to comply with any lawful orders to disperse, effectively entrapping large groups of marchers and then subjecting them to mass arrest.

125.    Plaintiff, like many of the hundreds of people arrested immediately during the Occupy Wall Street protests, was accused of the minor violations of disorderly conduct, New York Penal Law 240.20(5).

126.    Arrests of large numbers of people without probable cause to believe each individual was engaged in violation of any laws or regulations of the State or City of New York were carried out in such a way as to unlawfully suppress conduct protected by the First Amendment.

127.    Defendants' policy of indiscriminate mass arrest involved the following components:

    A.    Use of orange netting, lines of police officers and lines of police bicycles or scooters to corral and essentially trap large groups of people who were engaging, or were perceived by the NYPD as engaging, in political protest or demonstration.

    B.    Failure to distinguish bystanders, media personnel and legal observers from groups of corralled or trapped people prior to effecting arrests.

    C.    Giving the appearance, to any reasonable observer, of directing, ratifying, approving, or condoning a march route only to

subsequently trap and arrest marchers who believed their conduct to be in compliance with the law.

D.      Failure to advise prospective arrestees who were behaving in a peaceful and non-violent manner that they were in violation of any law or ordinance.

E.      Failure to give dispersal orders that, if given at all, were audible to all prospective arrestees.

F.      Failure to provide a reasonable opportunity to disperse, including actively preventing people who wanted to disperse from leaving.

128.    Plaintiff was arrested during one such mass arrest which took place on October 1, 2011, during which large numbers of people who were participating in a protest on the Brooklyn Bridge were arrested.

129.    The mass arrest policy employed by the defendants during the Occupy Wall Street protests substantially chilled the exercise of First Amendment rights. When police arrest large numbers of people engaged in lawful activity at or near demonstrations, those arrested are far less likely to feel comfortable engaging in protest activity in the future. Moreover, when such arrests are highly publicized event such as they were during the Occupy Wall Street protests, a message is sent to the public at large that participation in peaceful protest activity is criminal and is likely to lead to arrest.  The resultant "criminalization" of dissent and protest underlies defendants' mass arrest policy and the other policies alleged herein.

**Defendants' Policy, Custom or Practice of permitting widespread
harassment and unreasonable conditions of detention of transgender
detainees**

130.   Upon information and belief, defendants CITY OF NEW YORK,
BLOOMBERG, KELLY, ESPOSITO, HALL, DEVLIN, and ROEs 1-50 engaged in
policies, practices or customs which enabled, acquiesced to, or encouraged willful
disregard of unconstitutional harassment and unreasonable conditions of
confinement of transgender arrestees and detainees by NYPD officers.

131.   As a result, a substantial number of transgender people, including
plaintiff, have been subjected to transphobic and homophobic harassment and
ridicule and unconditional conditions of confinement by NYPD officers.

132.   Upon information and belief, defendants CITY OF NEW YORK,
BLOOMBERG, KELLY, DEVLIN, ESPOSITO, HALL, RICHARD and RACHEL
ROEs, JOHN DOE 1, JANE DOE 1 and JAMES and JULIE DOEs were aware of,
observed, and/or participated in this conduct and developed, implemented
and/or enforced a custom, policy, or practice of enabling, acquiescing, or willfully
turning a blind eye to it, failing to intervene, and failing to train, supervise, or
discipline officers engaged in such misconduct.

133.   Upon information and belief, defendants CITY OF NEW YORK,
BLOOMBERG, KELLY, ESPOSITO, HALL, DEVLIN, and RICHARD ROEs 1-50
have adopted, implemented and/or enforced a policy, practice or custom of
subjecting transgender individuals to unlawful conditions of detention, including,
but not limited to, being chained to railings or chairs for unreasonable periods of
time under unreasonable conditions, in locations inappropriate to the detention
of arrestees, as well as asking harassing, embarrassing, inappropriate, and

unnecessary questions of transgender people, including asking about their genitalia.

134.   In 2001, members of the NYPD chain of command, including Defendants DEVLIN, ESPOSITO and, upon information and belief, KELLY, had received complaints and were aware that transgender and gender non-conforming people were routinely handcuffed to railings and chairs in precincts, as opposed to being confined in cells with other non-transgender arrestees while detained in NYPD custody, and that this practice served to violate the rights of and harm transgender people and single them out for harassment and ridicule. Despite these defendants' awareness of this unconstitutional practice of improperly and discriminatorily detaining transgender people, and the existence of an internal recommendation to change policy to address these violations of the rights of transgender people, they failed to take any measures to prevent this practice and they failed to establish a policy that explicitly precludes this practice and punish those who engaged in it.

135.   According to "*Stonewalled: Police Abuse and Misconduct Against Lesbian, Gay, Bisexual and Transgender People in the U.S.*" (Amnesty International 2005), numerous transgender individuals detained by the NYPD have alleged that they have been subjected to unlawful, humiliating, painful and dangerous conditions of confinement, including, but not limited to, being placed with individuals who posed a risk to their safety, being held in isolation against their will, and being chained to railings, cell bars, chairs, and desks for unreasonable periods of time.

136.   In 2007, a deposition was taken by the City of New York in *Tikkun v. City of New York*, 05cv9901, of a transgender man who had been cuffed to a chair and railing in a Bronx precinct for an extended period of time and subjected to harassment and ridicule by NYPD officers, once again placing defendants on notice of this custom, policy and practice.

137.   Plaintiff, a transgender man, was, pursuant to such a policy, practice, and/or custom, removed from a cell where he was being held with other men, by Defendant John DOE 1, in the absence of any threat to any arrestee's safety, including plaintiff's, and in the absence of any complaints from any arrestee, and chained to a railing immediately adjacent to a bathroom for a period in excess of 8 hours. During this time, plaintiff's arm was wrenched into painful positions, and he was forced to remain in an uncomfortable and unnatural position for an excessive period of time, causing him to suffer pain and injury, as well as ridicule, humiliation and the discomfort of being in close proximity and sight of arrestees using the bathroom throughout this detention. Upon information and belief, defendants JOHN and JANE DOEs, RICHARD or RACHEL ROEs, and/or JAMES and JULIE DOEs either conducted, participated in, or failed to intervene to prevent these unconstitutional conditions of confinement.

138.   The policies, practices or custom of defendants CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, HALL, DEVLIN, JASKARAN, and ROEs 1-50 of (i) making mass arrests of persons lawfully participating in, observing, or in proximity to Occupy Wall Street demonstrations, and (ii) and of subjecting transgender individuals to transphobic harassment and unreasonable

conditions of confinement violated plaintiff's First, Fourth, and Fourteenth Amendment rights under the United States Constitution.

139.    In addition to declaratory relief against the defendants' unconstitutional policies and practices, plaintiff seeks compensatory and punitive damages for the emotional and physical injuries he suffered which were proximately caused by the defendants' unconstitutional conduct pursuant to these policies, practices and customs, as well as an award of attorneys' fees and costs.

## FEDERAL CAUSES OF ACTION

### First Claim for Relief
### Deprivation of Federal Civil Rights in Violation of 42 U.S.C. § 1983

140.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through the preceding paragraph with the same force and effect as if fully set forth herein, and incorporating them by reference.

141.    By implementing, enforcing, encouraging, sanctioning and/or ratifying policies, practices and/or customs punishing peaceful Occupy Wall Street protests through, *inter alia*, mass unlawful arrests without probable cause, permitting widespread and pervasive harassment of transgender arrestees, and directing that transgender arrestees be held under unreasonable and dangerous conditions of confinement, the defendants, acting under pretense and color of state law, in their individual and official capacities, within the scope of their employment, have deprived and will continue to deprive plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United

States, in violation of the rights guaranteed by the First, Fourth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

142.   The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

143.   The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures and the rules of the City of New York, the New York City Police Department, all under the supervision of ranking officers of said departments.

144.   Defendants, collectively and individually, while acting under the color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority which is forbidden by the United States.

145.   As a direct and proximate result of the misconduct and abuse of authority described above, plaintiff has suffered injury and damages, including, *inter alia*, deprivation of liberty, violation of the right to privacy and to be free of unreasonable search and seizure, physical and mental pain and suffering and mental anguish.

**Second Claim for Relief**
**False Arrest in Violation of 42 U.S.C. § 1983**

146.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through the preceding paragraph with the same force and effect as if fully set forth herein, and incorporating them by reference.

147.    As a result of the heretofore described conduct by defendants, plaintiff was subjected to an illegal, improper and false arrest by defendants, and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege or consent.

148.    By implementing, enforcing, encouraging, sanctioning and/or ratifying policies, practices and/or customs to punish peaceful Occupy Wall Street protests by, *inter alia*, engaging in indiscriminate mass arrests which were unlawful and without probable cause, the defendants, acting under pretense and color of state law and in their individual and official capacities and within the scope of their employment, have and will continue to deprive plaintiff of rights, remedies, privileges and immunities guaranteed by the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983.

149.    As a direct and proximate result of the foregoing, plaintiff's liberty was restricted for an extended period of time, he was subjected to handcuffs and other physical restraints, and to unreasonable, painful, and humiliating conditions of confinement, without probable cause or other lawful justification, in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States and their counterparts under the New York State Constitution, and has suffered injury and damages as a result, including, *inter alia*, physical and mental pain and suffering, and mental anguish.

**Third Claim for Relief**
**Malicious Prosecution in Violation of 42 U.S.C. § 1983**

150.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through the preceding paragraph with the same force and effect as if fully set forth herein, and incorporating them by reference.

151.    Defendants misrepresented and falsified evidence before the District Attorney.

152.    Defendants did not make a complete and full statement of facts to the District Attorney, and withheld exculpatory evidence from the District Attorney.

153.    Defendants were directly and actively involved in the initiation of criminal proceedings against plaintiff.

154.    Defendants lacked probable cause to initiate criminal proceedings against plaintiff.

155.    Defendants acted with malice in initiating criminal proceedings against plaintiff.

156.    Defendants were directly and actively involved in the continuation of criminal proceedings against plaintiff.

157.    Defendants misrepresented and falsified evidence throughout all phases of the criminal proceeding.

158.    Notwithstanding the perjurious and fraudulent conduct of the defendants, the criminal proceedings against plaintiff were terminated in Adkin's favor on a date no later than August 5, 2013 when all charges against him were dismissed.

**Fourth Claim for Relief**
**Malicious Abuse of Process in Violation of 42 U.S.C. § 1983**

159.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through the preceding paragraph with the same force and effect as if fully set forth herein, and incorporating them by reference.

160.   Defendants issued legal process to place plaintiff under arrest.

161.   Defendants arrested plaintiff in order to achieve a collateral objective beyond the legitimate ends of the legal process.

162.   Defendants acted with intent to do harm to plaintiff without excuse or justification.

163.   As a direct and proximate result of the misconduct and abuse of authority described above, plaintiff has suffered injury and damages, including, *inter alia*, physical and mental pain and suffering, and mental anguish.

**Fifth Claim for Relief**
**Excessive Force in Violation of 42 U.S.C. § 1983 and**
**the Fourth Amendment of the Constitution**

164.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through the preceding paragraph with the same force and effect as if fully set forth herein, and incorporating them by reference.

165.   The level of force employed by defendant JOHN DOE 1 and JANE DOE 1 against Mr. Adkins was objectively unreasonable and violated plaintiff's constitutional rights.

166.   As a result of the aforementioned conduct of the defendants, plaintiff was subjected to excessive force and sustained physical and emotional injuries.

**Sixth Claim for Relief**
**Denial of Equal Protection in Violation of 42 U.S.C. § 1983 and**
**the Fourteenth Amendment Based on Sex and Gender Identity**

167.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through the preceding paragraph with the same force and effect as if fully set forth herein, and incorporating them by reference.

168.   The conduct of defendants JOHN DOE 1, JANE DOE 1, RACHEL and RICHARD ROEs and JULIE AND JAMES DOEs as heretofore described was motivated by animus against Mr. Adkins on the basis of sex and gender identity.

169.   Defendants JOHN DOE 1, JANE DOE 1, RACHEL and RICHARD ROEs and JAMES and JULIE DOEs above acted with intent to treat plaintiff disparately on the basis of sex and gender identity.

170.    As a direct and proximate result of the misconduct and abuse of authority described above, plaintiff has suffered injury and damages, including, *inter alia*, physical and mental pain and suffering, humiliation and mental anguish and emotional distress.

**Seventh Claim For Relief**
**Violation of the First Amendment of the U.S. Constitution and**
**42 U.S.C. § 1983**

171.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered 1 through the preceding paragraph with the same force and effect as if fully set forth herein.

172.   The arrest and detention of plaintiff was intended to, and did, chill plaintiff's right to assemble peaceably.

173.   The arrest and detention of plaintiff was intended to, and did, chill plaintiff's right to free speech.

174.   The Defendants forcibly removed from plaintiff cell with other arrestees and handcuffed him in a metal rail in a room in the 90th Precinct, causing him to suffer pain, injury, ridicule, humiliation, mental anguish and distress, was done in order to punish plaintiff as a transgender individual thereby punishing his right to gender identity and expression in violation of his First Amendment rights.

**Eighth Claim For Relief**
**Unreasonable Conditions of Confinement Under 42 U.S.C. § 1983**

175.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered 1 through the preceding paragraph with the same force and effect as if fully set forth herein.

176.   Plaintiff was subjected to unlawful conditions of confinement including, but not limited to, being handcuffed to a railing for an unreasonable period of time in a painful and humiliating manner, denial of adequate food and water, denial of bathroom facilities, and/or denial of access to counsel.

177.   As a result of the foregoing, plaintiff sustained, *inter alia*, physical injuries, ridicule, emotional distress, embarrassment, and humiliation, and deprivation of his constitutional rights.

**Ninth claim for relief**
**Failure to Intervene in Violation of 42 U.S.C.§ 1983**

178.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered 1 through the preceding paragraph with the same force and effect as if fully set forth herein.

179.   Each and every individual defendant had an affirmative duty to intervene on plaintiff's behalf to prevent the violation of her constitutional rights.

180.   The individual defendants failed to intervene on plaintiff's behalf to prevent the violation of his constitutional rights incurred by his false arrest, illegal and overly intrusive searches and excessive detention despite having had a realistic opportunity to do so.

181.   As a result of the aforementioned conduct of the individual defendants, plaintiff's constitutional rights were violated.

**Tenth Claim for Relief**
**Municipal Liability Pursuant to 42 U.S.C. § 1983**

182.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through the preceding paragraph with the same force and effect as if fully set forth herein, and incorporating them by reference.

183.   Defendants, collectively and individually, while acting under color of state law, engaged in conduct that amounted to a custom, usage, practice, procedure or rule of the respective municipality/authority which is forbidden by the Constitution of the United States.

184.   The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department included, but were not limited to, (i) making mass arrests of persons lawfully participating in, observing, or in proximity to peaceful demonstrations; (ii) arresting individuals for peacefully participating in a political protest or for simply being in the vicinity of a political protest; and (ii) subjecting transgender

individuals to transphobic harassment and unreasonable conditions of confinement based solely on their gender identity.

185.    The foregoing customs, policies, usages, practices, procedures and rules of the City of New York, and the New York City Police Department demonstrate deliberate indifference to the safety, well-being, and constitutional rights of plaintiff.

186.    The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department were the moving force behind the constitutional violations suffered by plaintiff as alleged herein.

187.    Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating plaintiff's constitutional rights.

## Eleventh Claim for Relief
### Supervisory Liability For Deprivation of Rights Under the United States Constitution and 42 U.S.C. §§ 1981 and 1983

188.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered 1 through the preceding paragraph with the same force and effect as if fully set forth herein.

189.     By their conduct in failing to remedy the wrongs committed by employees of the THE CITY OF NEW YORK under their supervision; in failing to properly train, supervise, or discipline employees of the THE CITY OF NEW YORK under their supervision; and in directing employees under their supervision, defendants KELLY, ESPOSITO, HALL, DEVLIN, JASKARAN,

RICHARD and RACHEL ROEs, acting under the color of state law and in their individual and official capacities and within the scope of their employment, caused damage and injury in violation of plaintiff's rights guaranteed under 42 U.S.C. § 1983, and the United States Constitution, including its First, Fourth, and Fourteenth Amendments.

190.   As a result of the foregoing, plaintiff was deprived of liberty, suffered specific and serious bodily injury, pain and suffering, emotional distress, humiliation, costs and expenses, and was otherwise damaged and injured.

191.   All of the foregoing acts by defendants deprived plaintiff of federally protected rights, including, but not limited to, the right:

A.   Not to be deprived of liberty without due process of law;

B.   To be free from seizure and arrest not based upon probable cause;

C.   Not to be subjected to excessive force;

E.   To be free from unwarranted and malicious criminal prosecution;

F.   To be free from malicious abuse of process;

G.   To exercise his First Amendment rights;

H.   Not to be subjected to unlawful conditions of confinement;

J.   To receive equal protection under the law.

192.   As a direct and proximate result of the policies, practices and customs described above, plaintiff was unlawfully arrested and detained, and has suffered injury and damages, including, *inter alia*, physical and mental pain and suffering and mental anguish, and is entitled to compensatory damages to be determined at trial and punitive damages against the individual defendants to be determined at trial.

**WHEREFORE**, plaintiff respectfully requests that this Court:

A.      Enter a judgment declaring unconstitutional defendants' policies, practices and/or customs of a) engaging in mass arrests without individualized particularlized probable cause during political protests and b) subjecting transgender individuals to unreasonable and unconstitutional conditions of confinement due solely to their transgender status.

B.      Grant injunctive relief requiring defendants to return to plaintiff, or where necessary to expunge and/or destroy all records of fingerprints taken in conjunction with his arrest and all other information or records concerning his arrest, to remove from all records and databases maintained by defendants any reference to plaintiff's arrest, and to request that all law enforcement agencies that received information concerning plaintiff's arrest destroy such information.

C.      Award plaintiff compensatory damages in an amount to be determined at trial.

D.      Award punitive damages against the individual defendants in an amount to be determined at trial.

E.      Award the plaintiff reasonable attorneys' fees and costs.

F.      Grant such other and further relief as this court shall find as appropriate and just.

Dated:          New York, New York
                September 17, 2014


                                        Respectfully submitted,

                                        _____
                                        ANDREA J. RITCHIE (AR 2769)
                                        990 President St. 1B Brooklyn, NY 11225
                                        (646) 831-1243