UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------
JUSTIN ADKINS,

              Plaintiff,       :     14-cv-7519(JSR)

                     :

        -v-             :     OPINION AND ORDER

                     :

CITY OF NEW YORK, et al.,     :

                     :

          Defendants.   :
------------------------------ x

JED S. RAKOFF, U.S.D.J.

     Like hundreds of other Occupy Wall Street protesters,
plaintiff Justin Adkins was arrested on the Brooklyn Bridge on
October 1, 2011. Unlike the other protesters, Adkins, following his
arrest, was handcuffed to a wall for seven hours. Plaintiff alleges
he was treated differently because he is transgender. He brought the
present suit against the City of New York, former mayor Michael
Bloomberg, and various other officials, claiming (1) deprivation of
federal civil rights in violation of § 1983, based on defendants'
harassment and mistreatment of transgender arrestees; (2) excessive
use of force in violation of 42 U.S.C. § 1983 and the Fourth
Amendment; (3) denial of equal protection in violation of § 1983 and
the Fourteenth Amendment, based on sex and gender identity
discrimination; (4) violation of § 1983 and the First Amendment,
based on the punishing and chilling of plaintiff's gender identity
and expression; (5) unreasonable conditions of confinement under §
1983; (6) failure to intervene in violation of § 1983; (7) municipal
liability under § 1983; and (8) supervisory liability under §§ 1981

and 1983.[1] Defendants thereafter moved under Fed. R. Civ. P. 12(b)(6) to dismiss plaintiff's complaint in its entirety for failure to state a claim. The Court finds that it is obliged to grant defendants' motion in most respects, but that plaintiff's Equal Protection claim against the City of New York survives.

By way of background, plaintiff was detained during an Occupy Wall Street march on the Brooklyn Bridge roadway. He was taken to the 90th Precinct and initially held in a cell with other men. Neither plaintiff nor the other men complained, and no one raised any safety concerns. Nonetheless, plaintiff was removed from the cell and told to sit in a chair next to a bathroom. He was then handcuffed to a metal handrail and kept in this position for the next seven hours, resulting in soreness in his arm and shoulder over the next week. While plaintiff was handcuffed to the wall, other arrestees were provided with sandwiches, but plaintiff was denied food.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S.

---

[1] Not one to scrimp on causes of action, plaintiff also brought claims of false arrest, malicious prosecution, and malicious abuse of process, but he voluntarily dismissed those claims in light of the opinions of the Second Circuit and this Court in the related case of Garcia v. Bloomberg. See Garcia v. Does, 779 F.3d 84 (2d Cir. 2014); Garcia v. Bloomberg, No. 11-cv-6957, 2015 WL 5444122 (S.D.N.Y. Sept. 10, 2015); Letter of Plaintiff's Counsel dated Oct. 2, 2015.

662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court must draw all reasonable inferences in plaintiff's favor and accept as true all factual allegations in his complaint. In re Elevator Antitrust Litigation, 502 F.3d 47, 50 (2d Cir. 2007).

Plaintiff first claims that defendants used excessive force during his detention. The test for excessive force under the Fourth Amendment "'is one of objective reasonableness' . . . and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010) (citations omitted). Here, the temporary nature of plaintiff's alleged injury weighs heavily against his claim. See Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468-69 (S.D.N.Y. 2008). Plaintiff alleges only that he suffered soreness in his arm and shoulder lasting approximately one week. In the absence of continuing injury, the governmental interests in maintaining order and security in a precinct justify restraining a detainee outside of a cell. Plaintiff's excessive force claim fails.

Plaintiff's Fourteenth Amendment conditions of confinement claim fails for similar reasons. To state such a claim, "an inmate must allege that: (1) objectively, the deprivation the inmate

3

suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety.'" Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (citations omitted) (considering inmate's Eighth Amendment claim); see Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) ("Claims . . . of . . . serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."). The Court does not reach the second Walker prong because plaintiff's complaint does not satisfy the first. Although his detention was uncomfortable, plaintiff was not denied the minimal civilized measure of life's necessities. He was denied food for a relatively brief period and suffered no lasting injury as a result. See Rush v. Astacio, 159 F.3d 1348, at *2 (2d Cir. 1998) (Summary Order).

Next, although plaintiff did not voluntarily withdraw his First Amendment claim, he has framed it in contradictory and uncertain terms. In his briefing, plaintiff stated that his First Amendment claim is "squarely based on the right to protest and has nothing to do with his transgender identity." Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 11 n.9, ECF No. 10. However, at oral argument, defendant's counsel characterized

4

his claim as based on his gender expression, which counsel claimed was chilled by his arrest and treatment. See Transcript dated October 7, 2015. To the extent that plaintiff's First Amendment claim is based on the right to protest, it must be dismissed along with his false arrest claims under Garcia v. Does, 779 F.3d 84 (2d Cir. 2014). To the extent that plaintiff's First Amendment claim is based on his somehow stymied gender expression, it must also be dismissed: plaintiff cites no authority for this kludging together of anti-discrimination and First Amendment law.

This leaves plaintiff's Equal Protection claim. To prevail on an Equal Protection claim, "a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination[, and] show that the disparity in treatment cannot survive the appropriate level of scrutiny." Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005). With respect to the first half of this formulation, plaintiff has adequately alleged that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination. Plaintiff claims he was originally held with other male detainees in a general cell. Complaint ¶ 108, ECF No. 1 ("Compl."). But plaintiff, allegedly the only transgender detainee, was removed and held by himself in more deleterious conditions – handcuffed to a wall without food. Id. ¶¶ 109, 116, 117. Plaintiff

5

alleges that this disparate treatment was purposeful because it was pursuant to the NYPD's custom of subjecting transgender detainees to special conditions, viz., handcuffing them to railings. Id. ¶ 118, 134-36. He also alleges discriminatory intent on the basis of individual police officers' responses to learning of his transgender status, which included gawking, giggling, and inquiring about his genitalia. Id. ¶¶ 101, 115. These allegations render plaintiff's claims of intentional discrimination plausible.

When dealing with such a claim, the Court must first determine what level of scrutiny applies. Defendants argue that plaintiff's treatment is subject to the lowest level of scrutiny, i.e., rational basis review. See Lopez v. City of New York, 2009 WL 229956 at *13 (S.D.N.Y. Jan. 30, 2009).[2] Plaintiff argues that the

---

[2] Citing Bell v. Wolfish, 441 U.S. 520, 547 (1979), and Brown v. Plata, 131 S. Ct. 1910, 1928 (2011), defendants also seem to argue that rational basis is appropriate because defendants' treatment of plaintiff occurred while he was in custody. See Defendants' Memorandum of Law in Further Support of their Motion to Dismiss the Complaint with Prejudice at 10, ECF No. 11. However, Brown states clearly that "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." Brown, 131 S. Ct. at 1928-29; see Johnson v. California, 543 U.S. 499, 509 (2005) (holding that strict scrutiny rather than "reasonably related to penological interest" standard governed inmate's § 1983 Equal Protection claim). Regardless, the Court does not think that any issues of prison administration are implicated in this case: prior cases considering a lower standard of scrutiny for penological claims involved inmates held for extended periods of time in prisons, generally because they were convicted of crimes or denied bail pending trial. By contrast, plaintiff in the present case was detained, relatively briefly, for

6

appropriate standard of review is so-called "intermediate scrutiny" because discrimination against transgender people is a form of gender discrimination. See Glenn v. Brumby, 663 F.3d 1312, 1316-18 (6th Cir. 2011). Alternatively, plaintiff argues that intermediate scrutiny must be applied because transgender people are a so-called "quasi-suspect class," i.e. a classification that calls "for a more exacting standard of judicial review than is normally accorded economic and social legislation." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 442 (1985).

The Court concludes that transgender people are such a class in light of Windsor v. United States, 699 F.3d 169 (2d Cir. 2012). Windsor held that gay people were a quasi-suspect class on the basis of four factors: gay people have suffered a history of persecution; sexual orientation has no relation to ability to contribute to society; gay people are a discernible group; and gay people remain politically weakened. Id. at 181-85. While transgender people and gay people are not identical, they are similarly situated with respect to each of Windsor's four factors.

First, transgender people have suffered a history of persecution and discrimination. As the Second Circuit put it with

_____

the violation of disorderly conduct; all charges against him were later dismissed.

7

respect to gay people, this is "not much in debate." Id. at 182.
Moreover, this history of persecution and discrimination is not yet
history. Plaintiff cites data indicating that transgender people
report high rates of discrimination in education, employment,
housing, and access to healthcare. See Plaintiff's Memorandum of Law
in Opposition to Defendants' Motion to Dismiss at 18 n.14, ECF No. 10
(citing National Center for Transgender Equality and National Gay and
Lesbian Task Force, Injustice at Every Turn, A Report of the National
Transgender Discrimination Survey, 2011).

     Second, transgender status bears no relation to ability to
contribute to society. Some transgender people experience
debilitating dysphoria while living as the gender they were assigned
at birth, but this is the product of a long history of persecution
forcing transgender people to live as those who they are not. The
Court is not aware of any data or argument suggesting that a
transgender person, simply by virtue of transgender status, is any
less productive than any other member of society.

     Third, transgender status is a sufficiently discernible
characteristic to define a discrete minority class. The test is
"whether there are 'obvious, immutable, or distinguishing
characteristics that define . . . a discrete group.'" Windsor, 699
F.3d at 183 (quoting Bowen v. Gilliard, 483 U.S. 587, 602 (1987)).

8

Specifically, "[w]hat seems to matter is whether the characteristic of the class calls down discrimination when it is manifest." Windsor, 699 F.3d at 183. Windsor helpfully describes the scenarios of a person of illegitimate birth applying for Social Security benefits and thereby making their illegitimate status manifest, or two gay people seeking a marriage license and thereby revealing their homosexuality. Transgender people struggle with similar scenarios on an even more frequent basis: many forms of identification required for asserting legal rights, such as birth certificates, indicate the bearer's gender. A mismatch between the gender indicated on the document and the gender of the holder calls down discrimination, among other problems. Document troubles aside, transgender people often face backlash in everyday life when their status is discovered. For instance, plaintiff alleges that, upon learning that he was transgender, police officers gawked and giggled at him and asked him what he had "down there." Compl. ¶¶ 101, 115.

Fourth, transgender people are a politically powerless minority. "The question is whether they have the strength to politically protect themselves from wrongful discrimination." Windsor, 699 F.3d at 184. Particularly in comparison to gay people at the time of Windsor, transgender people lack the political strength to protect themselves. For example, transgender people cannot serve openly in the military, see Department of Defense Instruction 6130.03

9

at 48 (incorporating changes as of September 13, 2011), as gay people could when Windsor was decided. See Don't Ask, Don't Tell Repeal Act of 2010, Pub. L. No. 111-321, 124 Stat. 3515. Moreover, like gay people, it is difficult to assess the degree of underrepresentation of transgender people in positions of authority without knowing their number relative to the cisgender population. However, in at least one way this underrepresentation inquiry is easier with respect to transgender people: for, although there are and were gay members of the United States Congress (since Windsor, in both houses), as well as gay federal judges, there is no indication that there have ever been any transgender members of the United States Congress or the federal judiciary.

Upon consideration of these factors, the Court concludes that transgender people are a quasi-suspect class. Accordingly, the Court must apply intermediate scrutiny to defendants' treatment of plaintiff. To state a claim on this basis, plaintiff's complaint must adequately allege that his removal from the general cell and handcuffing were not "substantially related to an important government interest." Windsor, 699 F.3d at 185 (quoting Clark v. Jeter, 485 U.S. 456, 461 (1988)). On its face, the complaint does so.

In response, defendants raise two arguments that their treatment of plaintiff survives intermediate scrutiny. First, they

10

argue that there is no constitutional right to be detained with cellmates of the same gender. See Defendants' Memorandum of Law in Support of their Motion Pursuant to Fed. R. Civ. P. 12(b)(6) to Dismiss the Complaint with Prejudice at 25, ECF No. 9 (citing Lopez v. City of New York, 2009 WL 229956 at *13 (S.D.N.Y. Jan. 30, 2009)). Defendants' arguments miss the point: the question here is not whether there is a stand-alone right to be detained with cellmates of the same gender. Instead, the inquiry is whether defendants' discriminatory actions, whatever form they took, were substantially related to an important government interest. Moreover, Lopez applied rational basis review, which is no longer appropriate in light of Windsor, decided three years later.

Second, defendants argue that safety concerns justify their treatment of plaintiff. Defendants cite to plaintiff's own complaint, which states that "numerous transgender individuals detained by the NYPD have alleged that they have been . . . placed with individuals who posed a risk to their safety." Compl. ¶ 135. However, plaintiff clearly alleges that there were no safety concerns in this case: neither he nor the men with whom he was initially held raised any safety concerns. Id. ¶ 108. On a motion to dismiss, the Court must accept these allegations as true. Accordingly, the fact that other transgender detainees have been placed with individuals who posed a risk to their safety cannot justify defendants' disparate treatment

11

of plaintiff in the present case, where no safety concerns were implicated. Moreover, defendants cannot argue their actions were substantially related to ensuring plaintiff's safety when they removed him from an allegedly safe place and caused him injury, albeit minimal injury, by handcuffing him to a wall next to the sole bathroom in the precinct. Id. ¶¶ 108-13.

Although plaintiff's complaint therefore states a claim that his Fourteenth Amendment rights were violated, the claim must still be dismissed if defendants can successfully plead the affirmative defense of qualified immunity. An official is entitled to immunity if "his action was 'objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.'" Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010) (citations omitted). The defense of qualified immunity extends to supervisory liability claims. See Poe v. Leonard, 282 F.3d 123, 134 (2d Cir. 2002) ("[A] supervisor may not be held liable unless both legal theories [of the supervisee's violation and of supervisory liability] were clearly established."). Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment were not clearly established at the time of his arrest on October 1, 2011. Windsor v. United States, 699 F.3d 169 (2d Cir. 2012), was not decided until October 18, 2012, and the Second Circuit had not previously ruled on what protections are accorded lesbian, gay, bisexual, or transgender

people under the Fifth or Fourteenth Amendments. Accordingly, defendants could not be expected to know that their actions would be subject to any standard more stringent than rational basis review.

While the Court does not reach the question of whether defendants' actions would survive rational basis review on the merits, it does hold that it would have been objectively reasonable for defendants to conclude as much and that qualified immunity therefore attaches. See Taravella v. Town of Wolcott, 599 F.3d 129, 135 (2d Cir. 2010) (explaining that question of whether a defendant's action is objectively reasonable is separate from whether a constitutional violation has occurred and whether the right was clearly established). Particularly because many transgender detainees have alleged that they have been held with individuals who posed a risk to their safety, see Compl. ¶ 135, it was reasonable for defendants to conclude that it would not be arbitrary or irrational to hold plaintiff separately. See Kelley v. Johnson, 425 U.S. 238, 248 (1976). Accordingly, the individual defendants are entitled to immunity, and all claims against them must be dismissed.

The defense of qualified immunity is, however, unavailable to one defendant in this case, the City of New York (the "City"). Plaintiff brings his claim against the City under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). Under Monell, "[l]ocal

governing bodies . . . can be sued directly under § 1983 for
monetary, declaratory, or injunctive relief where . . . the action
that is alleged to be unconstitutional implements or executes a
policy statement, ordinance, regulation, or decision officially
adopted and promulgated by that body's officers." Qualified immunity
of individual actors is irrelevant to Monell liability. Askins v. Doe
No. 1, 727 F.3d 248, 254 (2d Cir. 2013).

     Monell liability does require that plaintiff adequately
allege a policy or pattern of misconduct. A municipality's policy
need not be explicitly stated or adopted. Vann v. City of New York,
72 F.3d 1040, 1049 (2d Cir. 1995). Instead, "Monell's policy or
custom requirement is satisfied where a local government is faced
with a pattern of misconduct and does nothing, compelling the
conclusion that the local government has acquiesced in or tacitly
authorized its subordinates' unlawful actions." Reynolds v. Giuliani,
506 F.3d 183, 192 (2d Cir. 2007). Plaintiff has alleged that both
eyewitness accounts and internal police documents show the existence
of a specific pattern of misconduct, viz., handcuffing transgender
detainees to railings, and further show official inaction in the face
of this pattern. Plaintiff claims that an internal NYPD
recommendation called for changes in the department's treatment of
transgender people, but the NYPD chain of command took no steps in
response to it. Compl. ¶ 134. He claims that numerous transgender

people detained by the NYPD have alleged they were chained to railings. Id. ¶¶ 135-36.[3] For instance, plaintiff describes the 2007 deposition testimony of a transgender man who had been handcuffed to a railing. Id.

Defendants object that plaintiff has failed to show the existence of "concentrated, fully packed, precisely delineated scenarios" of misconduct. Carter v. District of Columbia, 795 F.2d 116, 125 (D.C. Cir. 1986). They also object that articles and reports are insufficient to establish a pattern of misconduct. See Defendants' Memorandum of Law in Support of their Motion Pursuant to Fed. R. Civ. P. 12(b)(6) to Dismiss the Complaint with Prejudice, at 19, ECF No. 9 (citing Delrosario v. City of New York, No. 07-cv-2027, 2010 WL 882990, at *7 (S.D.N.Y. Mar. 4, 2010) (holding New York Times article and third-party lawsuit inadmissible); Allen v. City of New York, 480 F. Supp. 2d 689, 720 (S.D.N.Y. 2007) (holding single CNN article insufficient to establish custom or policy); Richardson v. Nassau County, 277 F. Supp. 2d 196, 204 (E.D.N.Y. 2003) (holding single article insufficient to establish custom or policy)).

---

[3] Defendants object that, under Fed. R. Evid. 201, the Court may not take judicial notice of the Amnesty International report cited by plaintiff in ¶ 135 of his complaint. Defendants have filed a motion to dismiss, and the Court must take all of plaintiff's allegations as true when determining whether he has stated a claim. At this time, the Court does not and need not take any position on the admissibility of possible evidence.

Defendants' objections fall short. First, plaintiff bases his allegations on more than a single news article. More importantly, the cases upon which defendants rely all involved motions for summary judgment or directed verdicts. Accordingly, they applied different standards than those the Court is charged with applying here. The Court does not and need not take any position on the admissibility or ultimate sufficiency of plaintiff's possible evidence. It asks only whether plaintiff has "nudged [his] claims across the line from conceivable to plausible." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). He has done so.

For the foregoing reasons, defendants' motion is hereby granted with respect to all of plaintiff's claims, except for his § 1983 claims against the City of New York for violation of his rights under the Equal Protection Clause of the Fourteenth Amendment. Counsel should jointly call Chambers by no later than November 19, 2015 to schedule further proceedings with regard to the remaining claim.

The Clerk of Court is directed to close document number 8 on the docket of this case.

SO ORDERED.

Dated:    New York, NY
          November 15, 2015            JED S. RAKOFF, U.S.D.J.

16